# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF OKLAHOMA

GEORGE OCHOA,                              )
                                           )
        Petitioner,               )
                                           )
v.                                         )    Case No. CIV-06-1348-R
                                           )
RANDALL G. WORKMAN, Warden,                )
    Oklahoma State Penitentiary,       )
                                           )
        Respondent.              )

## MEMORANDUM OPINION

Petitioner, a state prisoner currently facing execution of a sentence of death, appears with counsel and petitions for a Writ of Habeas Corpus pursuant to 28 U.S.C.A. § 2254, challenging his sentence of death and his post-conviction mental retardation trial. Respondent has responded to Petitioner's *Petition for a Writ of Habeas Corpus* (hereinafter "Petition.")[1] Petitioner has replied to this response. The state court record of the post-conviction mental retardation trial has been supplied.

## I. PROCEDURAL HISTORY

This is Petitioner's second Petition for Writ of Habeas Corpus. During his pending appeal with the Tenth Circuit Court of Appeals from the denial of habeas relief on his first Petition for Writ of Habeas Corpus, the United States Supreme Court issued its decision in <u>Atkins v. Virginia</u>, 536 U.S. 304 (2002), determining that the execution of mentally retarded persons constitutes cruel and unusual punishment in violation of the Eighth Amendment. The Tenth Circuit stayed Petitioner's

---

[1] References to the parties' pleadings shall be as follows: Petitioner's *Petition for a Writ of Habeas Corpus* shall be cited as (Pet. at __.); Respondent's *Motion to Dismiss and Response to Petitioner's Second Petition for Writ of Habeas Corpus* shall be cited as (Resp. at __.); Petitioner's *Reply* shall be cited as (Reply at __.). The transcript of the mental retardation proceedings shall be cited as (Tr., Vol. ___, p. __.).

appeal and held it in abeyance to allow him to litigate his mental retardation claim in state court.

Petitioner filed a second application for post-conviction relief in the Oklahoma Court of Criminal Appeals ("OCCA"). The court denied post-conviction relief on two of his claims, but granted a request for an evidentiary hearing on the issue of whether he is mentally retarded. After two evidentiary hearings, the OCCA remanded Petitioner's case to the Oklahoma County District Court for a jury trial on his mental retardation issue. The jury trial was conducted June 20-21, 2005, and the jury returned a verdict of Not Mentally Retarded. Petitioner and the State filed supplemental briefs with the OCCA. On May 25, 2006, the OCCA issued its opinion upholding the jury determination and denying relief. Ochoa v. State, 136 P.3d 661 (Okla. Crim. App. 2006). On November 22, 2006, Petitioner filed a Motion of Appellant for Authorization to File a Second Petition for Writ of Habeas Corpus in the Tenth Circuit Court of Appeals. On April 6, 2007, the motion was granted. Ochoa v. Sirmons, 485 F.3d 538 (10th Cir. 2007).

## II. FACTUAL BACKGROUND

Under 28 U.S.C. § 2254(e), when a federal district court addresses "an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct." 28 U.S.C. § 2254(e)(1). For the purposes of consideration of the present Petition, the Court provides and relies upon various factual synopses throughout this Memorandum Opinion from the OCCA's opinion summarizing the evidence presented at Petitioner's mental retardation trial. Following review of the record and the trial transcripts, the Court finds the summaries by the OCCA to be adequate and accurate, and therefore, adopts the factual summaries as its own unless otherwise stated.

## III. PETITIONER'S CLAIMS FOR RELIEF

## A. PRELIMINARY CONSIDERATIONS.

On April 6, 2007, the Tenth Circuit Court of Appeals granted Petitioner authorization to pursue a second or successive habeas petition raising an Atkins challenge to his death sentence. Ochoa v. Sirmons, 485 F.3d 538 (10th Cir. 2007). The Court held that Petitioner had made the required prima facia showing for authorization to proceed under 28 U.S.C. § 2244(b)(2)(A). Id. at 539. The Court found, and the State conceded, that Petitioner's Atkins claim satisfied the conditions of § 2244(b)(2)(A) as it relied "'on a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable.'" Id. at 541 (quoting statute). The Court further stated:

> The point of the language is to make it clear that the authorization provided by an appellate court under § 2244(b)(3)© is only a preliminary determination that a claim satisfies the statutory conditions; it is for the district court, under § 2244(b)(4), to confirm that "the petition d[oes], in fact, satisfy the requirements of § 2244(b)" when it hears the case (and to summarily dismiss if the requirements are not met).

Id. at 543 (quoting LaFevers v. Gibson, 238 F.3d 1263, 1265 (10th Cir. 2001)).

Title 28 U.S.C. § 2244(b)(4) provides that "[a] district court shall dismiss any claim presented in a second or successive application that the court of appeals has authorized to be filed unless the applicant shows that the claim satisfies the requirements of this section." Prior to considering the merits of the claim, this Court must first determine whether Petitioner has met the requirements of § 2244(b)(2)(A), which provides:

> (2) A claim presented in a second or successive habeas corpus application under section 2254 that was not presented in a prior application shall be dismissed unless - -
>
> (A) the applicant shows that the claim relies on a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable;

Respondent conceded in his response to Petitioner's application in the Tenth Circuit that Petitioner had satisfied the conditions of § 2244(b)(2)(A) by making a prima facia showing. Here, however, Respondent asserts the position that this Court must thoroughly review individually each proposition (i.e., "claim") contained in Petitioner's second habeas petition and dismiss "each 'claim' which does not meet the requirements of § 2244(b)." (Resp. at 7.)

At the Tenth Circuit, Petitioner sought permission to challenge his sentence on the basis that he is mentally retarded and ineligible for the death penalty under Atkins. In its opinion authorizing him to proceed with a second or successive habeas petition, the Court identified Petitioner's Atkins assertion as his claim. See Ochoa, 485 F.3d at 539 ("He contends he is entitled to proceed on this new claim for two reasons . . . ."); Id. at 541 (state conceding Petitioner's Atkins "claim" satisfies § 2244(b)(2)(A)); Id. (Petitioner "entitled to proceed on his Atkins claim in the district court."). Most importantly, the Tenth Circuit stated when considering the issue of injecting the merits of a claim into its authorization inquiry that "the petitioner's mental retardation is the Atkins claim; the constitutional validity of a petitioner's capital sentence hinges entirely on that single premise." Id. at 544.

Petitioner's instant claim falls within a narrow category of cases. To review his second or successive habeas petition as Respondent asserts, i.e., applying § 2244(b)(2)(A) to each individual ground for relief, would be unreasonable under the procedural aspects of this case and contrary to the intentions of the statute and the mandate of the Supreme Court in Atkins. Had Petitioner initially been tried after the decision in Atkins, he could have raised his claim of mental retardation prior to or during his criminal trial and each of his propositions attacking the constitutional validity of his sentence would be available for appellate and collateral review. Under the procedural circumstances

4

involved here, the Court sees no justification that review of Petitioner's <u>Atkins</u> claim should now be any different.

As the Tenth Circuit identified, and the State conceded, Petitioner's first habeas petition was denied in 2001. While on appeal from that denial, the Supreme Court decided <u>Atkins</u>, determining mentally retarded persons are ineligible for the death penalty and making its holding retroactively applicable to cases on collateral review. Petitioner returned to state court to pursue his <u>Atkins</u> claim in a post-conviction proceeding, where a trial was ordered by the OCCA on the issue of his mental retardation. Subsequent to his denial of his <u>Atkins</u> claim in state court, Petitioner sought authorization with the Tenth Circuit to pursue a second or successive habeas claim in this Court for habeas relief under <u>Atkins</u>. Pursuant to § 2244(b)(2)(A), this Court finds that Petitioner's <u>Atkins</u> claim satisfies the statute's requirements to proceed with a second or successive habeas petition, as <u>Atkins</u> was a new rule of constitutional law, previously unavailable to Petitioner, made retroactive by the Supreme Court to cases on collateral review. Accordingly, Respondent's Motion to Dismiss is denied.

**B. THE STANDARD OF REVIEW**

Under the Antiterrorism and Effective Death Penalty Act of 1996 (hereinafter "AEDPA"), in order to obtain federal habeas relief once a state court has adjudicated a particular claim on the merits, Petitioner must demonstrate that the adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C.A. § 2254(d)(1-2).

The Supreme Court defined "contrary to" as a state court decision that is "substantially different from the relevant precedent of this Court." Williams v. Taylor, 529 U.S. 362, 405 (2000) (O'Connor, J., concurring and delivering the opinion of the Court). A decision can be "contrary to" Supreme Court precedent "if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from [Supreme Court] precedent." Id. at 406. The "unreasonable application" prong comes into play when "the state court identifies the correct governing legal rule from [Supreme Court] cases but unreasonably applies it to the facts of the particular state prisoner's case" or "unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." Id. at 407. The "AEDPA's purpose [was] to further the principles of comity, finality and federalism. There is no doubt Congress intended AEDPA to advance these doctrines." Williams v. Taylor, 529 U.S. 420, 436 (2000).

### C.    GROUNDS FOR RELIEF

Ground 1:    Burden of Proof.

In his first ground for relief, Petitioner asserts that the Constitution requires the State to prove the absence of mental retardation beyond a reasonable doubt and that the State violated his Sixth, Eighth and Fourteenth Amendment rights when it placed the burden on him to prove he is mentally retarded by a preponderance of the evidence. Respondent argues Petitioner brought this issue at the OCCA under state law and that the substance of the federal claim was not fairly presented to the state court. Accordingly, Respondent continues, this issue is not exhausted, is procedurally barred

from review, and Petitioner has not demonstrated cause and prejudice or a miscarriage of justice to entitle him to habeas review. Lastly, Respondent asserts that under <u>Atkins</u>, this is an issue of state law not cognizable in federal habeas and that due process does not require a state to prove that a defendant is mentally retarded beyond a reasonable doubt.

Petitioner raised a claim of error in the OCCA requesting that the state court review and overrule its prior decisions regarding the burden of persuasion and burden of proof in this type of case:

> Prior to his jury trial on mental retardation, Ochoa asked the trial court to reverse the order of proof and shift the burden to the State to prove he was not mentally retarded beyond a reasonable doubt. The trial court denied the motion prior to voir dire and thereafter instructed the jury that Mr. Ochoa carried the burden of proving mental retardation by a preponderance of the evidence. In his first claim of error, Mr. Ochoa asks this Court "to revisit and overrule its prior decisions regarding the burdens of persuasion and proof in these types of cases and to hold that the State bears the burden of persuasion by the beyond a reasonable doubt standard that the Petitioner is not mentally retarded."
>
> * * *
>
> This procedure has evolved somewhat since our first effort in <u>Murphy</u>, but a constant in the development of this area of the law in Oklahoma is that the burden of proof in a mental retardation jury trial shall be upon the petitioner/defendant to prove mental retardation by a preponderance of the evidence. <u>Murphy</u>, 2002 OK CR 32, ¶ 31, 54 P.3d at 568; <u>Blonner</u>, 2006 OK CR 1, ¶ 3, 127 P.3d at 1139; <u>Lambert</u>, 2003 OK CR 11, ¶ 4, 71 P.3d at 32; <u>Bass</u>, 2004 OK CR 14, ¶ 8, 87 P.3d at 631-632; <u>Myers</u>, 2005 OK CR 22, ¶ 6, 130 P.3d at 265.
>
> Contrary to Ochoa's claim, we do not believe the principles underlying the Supreme Court's decision in <u>Atkins</u> require this Court to overrule our decisions dealing with the burden and standard of proof in mental retardation jury trials. To require the defendant/petitioner to show by a preponderance of the evidence his or her mental retardation to establish ineligibility for a sentence of death does not violate either of Oklahoma's constitutional provisions which ensure due process of law and protect against the infliction of cruel or unusual punishment. See Okla. Const. art.II, §§ 7, 9.
>
> Further, we are not persuaded to restructure our procedure by the New Jersey Superior Court's holding in <u>State v. Jimenez</u>, 380 N.J.Super. 1, 880 A.2d 468 (Ct.App.Div.2005), which requires the State to establish the absence of mental

retardation beyond a reasonable doubt. The holding in <u>Jimenez</u> that the burden should be on the State to prove a defendant's mental retardation is based upon that Court's interpretation of its own State Constitution and upon its public policy grounds. <u>Jimenez</u>, 880 A.2d at 489. Accordingly, Ochoa's first proposition of error is denied.

<u>Ochoa</u>, 136 P.3d at 664-65.[2]

This Court need not address Respondent's exhaustion argument if the issue may be denied on the merits. 28 U.S.C. § 2254(b)(2). In <u>Atkins</u>, the Supreme Court left to the states "'the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences.'" <u>Atkins</u>, 536 U.S. at 317 (quoting <u>Ford v. Wainwright</u>, 477 U.S. 399, 405 (1986)). Oklahoma determined in the development of its procedure regarding mental retardation trials that the burden of proof shall be upon the petitioner/defendant to prove mental retardation by a preponderance of the evidence. <u>See</u> <u>Murphy v. State</u>, 54 P.3d 556, 568 (Okla. Crim. App. 2002). Because the Supreme Court left the development of this procedure to the states, the burdens of proof and persuasion are matters of state law and not cognizable in federal habeas proceedings. <u>See</u> <u>Estelle v. McGuire</u>, 502 U.S. 52 (1991).

Petitioner relies on an overruled New Jersey Court of Appeals case in his plea to this Court to conclude "that the absence of mental retardation is akin to a 'capital trigger' that increases the maximum punishment and must therefore be proved (or in this case disproved) beyond a reasonable doubt under <u>Blakely v. Washington</u>, 542 U.S. 296 (2004)." (Pet. at 12.) <u>Blakely</u> is not applicable to the instant case. The Supreme Court determined in <u>Blakely</u> that a sentencing judge's determination violated the defendant's Sixth Amendment right to a trial by jury. Petitioner attempts

---

[2] Petitioner acknowledges that <u>State v. Jimenez</u>, 880 A.2d 468 (N.J. Super. Ct. App. Div. 2005), was overruled by <u>State v. Jimenez</u>, 908 A.2d 181 (N.J. 2006).

to support his tenuous argument with language from <u>Blakely</u> that "'any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.'" <u>Id.</u> at 301 (quoting <u>Apprendi v. New Jersey</u>, 530 U.S. 466, 490 (2000). Mental retardation does not increase the penalty for a crime. Conversely, pursuant to <u>Atkins</u>, mental retardation eliminates the death penalty for the possible available sentences for first-degree murder.[3]

The Fifth Circuit has held in <u>U.S. v. Webster</u>, 421 F3d 308, 312 (5th Cir. 2005), that the Constitution does not require the state to disprove the existence of mental retardation beyond a reasonable doubt. This rationale is consistent with the Supreme Court's determination that a state may presume a defendant to be competent and require him to carry the burden of proving his competence by a preponderance of the evidence:

> Once a State provides a defendant access to procedures for making a competency evaluation, however, we perceive no basis for holding that due process further requires the State to assume the burden of vindicating the defendant's constitutional right by persuading the trier of fact that the defendant is competent to stand trial.

<u>Medina v. California</u>, 505 U.S. 437, 449 (1992).

The OCCA's determination need not be aware of or even cite to Supreme Court opinions so long as neither the reasoning nor the result of the state court's decisions contradicts them. <u>Mitchell v. Esparza</u>, 540 U.S. 12 (2003). Petitioner has not demonstrated the determination by the state court was contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court. 28 U.S.C. § 2254(d)(1).

<u>Ground 2:</u>      <u>Relevant Time Period of Mental Retardation</u>.

---

[3] Additionally, the issue of whether Petitioner is mentally retarded was submitted to a jury.

In his second ground for relief, Petitioner asserts the trial court incorrectly tied the constitutional prohibition against execution of mentally retarded persons to the time of the trial and not to the time of the offense. Respondent responds that the state's task under <u>Atkins</u> of establishing procedures enforcing the restrictions against the execution of mentally retarded offenders was neither contrary to, nor an unreasonable application of, clearly established federal law. Additionally, Respondent asserts that the evidence presented at the trial does not support a finding that Petitioner was mentally retarded at any time.

The OCCA considered Petitioner's claim and denied it in theory and on the merits:

> In Proposition Two, Ochoa argues that the Supreme Court's holding in <u>Atkins</u> prohibits the State from executing a person who was mentally retarded at the time the crimes were committed, not at the time of the jury trial on the issue of mental retardation. Evidence presented at Ochoa's jury trial on mental retardation showed that Ochoa scored higher on intelligence tests given in 2003 than on those given to him in 1995 and 1996. Evidence also was presented which showed Ochoa had learned to read and write while incarcerated and suggested his ability to learn to read and write likely contributed to his more current test performance.

> Counsel for Ochoa requested the trial court instruct the jury that it must find Ochoa was mentally retarded at the time of the offense and the trial court denied the requested instructions. Ochoa argues that the focus of the Court in <u>Atkins</u> was upon the moral culpability of the offender at the time of the crime and the relevant constitutional inquiry is not whether the offender is retarded at the moment, but rather whether the offender was retarded when the crime occurred. He asks this Court to vacate the jury's verdict because it was rendered upon instructions which required it to find Ochoa was presently mentally retarded.

> Although the Court in <u>Atkins</u> did not specifically define "mental retardation" for the individual States and left it to the States "the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences," there it referenced two generally accepted clinical definitions. <u>Atkins</u>, 536 U.S. at 317, n. 22, 122 S.Ct. at 2250, n. 22. Both definitions require mental retardation to be present before the age of eighteen (18). <u>Atkins</u>, 536 U.S. at 308, n. 3, 318, 122 S.Ct. at 2245, n. 3, 2250 (AAMR definition requires mental retardation to "manifest" before age eighteen; American Psychiatric Association's definition states the "onset must occur before" eighteen (18)).

We disagree with Ochoa's description of mental retardation as a "fluid concept." While we do not dispute that a mentally retarded person can learn and develop skills, that ability is limited and the ability to learn and to adaptively function suggests the individual was likely not mentally retarded in the first place but fell into that borderline range or classification due to environmental or other factors which affected present ability. The witness at Ochoa's trial acknowledged this when she testified that some people functioning at a low level due to environment, education or impoverishment could move "above the level" of mental retardation classification by increasing his or her abilities to function. That Ochoa may have had an IQ score within the range of 70 to 75 at the time of the crime is relevant but does not prove mental retardation. "I.Q. tests alone are not determinative of the issue of mental retardation." Myers, 2005 OK CR 22, ¶ 8, 130 P.3d at 268.

The requisite cognitive and behavioral impairments attendant to mental retardation, as defined by this Court in evaluating Eighth Amendment claims, substantially limits one's ability to understand and process information, to communicate, to learn from experience or mistakes, to engage in logical reasoning, to control impulses, and to understand the reactions of others. We do not dispute the fact that a mentally retarded person can learn. However, a person who can learn beyond the accepted clinical definitions of mental retardation does not fall within the definition of those persons who may avoid execution due to mental retardation. The evidence presented at Ochoa's mental retardation jury trial showed he does not function at a significantly sub-average intellectual level that substantially limits his ability to understand and process information, to communicate, to learn from his mistakes, to engage in logical reasoning, to control impulses, and to understand the reaction of others. The jury was properly instructed it must find Ochoa "is" mentally retarded, as opposed to finding that he "was" mentally retarded at the time of the crime.

Ochoa, 136 P.3d at 665-66.

Petitioner asserts that Atkins supports his theory because of language outlining one of the reasons for prohibiting the execution of mentally retarded persons: "Because of their disabilities in areas of reasoning, judgment, and control of their impulses, however, they do not act with the level of moral culpability that characterizes the most serious adult criminal conduct. Moreover, their impairments can jeopardize the reliability and fairness of capital proceedings against mentally retarded defendants." Atkins, 536 U.S. at 306-07. Petitioner contends this language directs the inquiry not to whether the offender is retarded at the moment, but rather whether he was retarded

at the time the crime took place.[4]

What is absent from Petitioner's argument, however, is that the Supreme Court left to the states the task of defining and establishing procedures to enforce <u>Atkins</u>' constitutional restrictions against the execution of mentally retarded persons. The state of Oklahoma established criteria in accordance with the definitions referred to by the Supreme Court for the evaluation of mental retardation. As part of those procedures and criteria, Oklahoma determined the proper inquiry is whether the petitioner/defendant <u>is</u> mentally retarded. Petitioner has failed to demonstrate that the determination by the OCCA was contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court. 28 U.S.C. § 2254 (b)(1).

Even if the inquiry was to be focused on the time of the criminal act, Petitioner's claim would still fail. Only one witness testified at the mental retardation trial. Dr. Hall, expert for the Petitioner, testified that Petitioner was not mentally retarded at the time of the trial. (Tr., Vol. II, p. 292) Although Dr. Hall testified on direct examination regarding limitations in Petitioner's testing due to inability to speak and write English and inadequate schooling, she ultimately stated that she could not say it was more probable than not that he was mentally retarded at the time of the crime:

> Q.      So you're clearly not telling this jury that it's more probably true than not that he was mentally - - or was mentally retarded. He's not today. Can you say it is more probably true than not that he ever was?
> A.      I cannot say that.

(Tr., Vol. II, p. 293)

Petitioner has failed to demonstrate the state court's determination was contrary to, or an

---

[4] Petitioner ignores, however, other references by the Supreme Court to mental retardation in the present tense: Testimony was presented that Atkins was mentally retarded at the time of the trial. <u>Id.</u> at 308; and, "*Mental retardation* refers to substantial limitations in <u>present</u> functioning." <u>Id.</u> at 309 n.3 (underlining added).

unreasonable application of, clearly established federal law as determined by the Supreme Court. 28 U.S.C. § 2254(d)(1). Nor has Petitioner demonstrated the jury's determination and the state court's factual determination that he is or was not mentally retarded resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. 28 U.S.C. § 2254(d)(2).

Ground 3:       Fundamental Fairness of Trial.

In his third ground for relief, Petitioner claims his mental retardation trial was fundamentally unfair when statements and evidence of prior criminal convictions were introduced, and when he was "forced" to trial wearing his county jail orange coveralls and a "shock sleeve".[5] Respondent responds that petitioner has failed to demonstrate the state court determination was contrary to clearly established federal law or an unreasonable determination of the facts. 28 U.S.C. § 2254(d).

Petitioner raised these issues in the OCCA and was denied relief. As to the jury receiving information that Petitioner was in custody and that the trial involved a criminal matter, the OCCA determined:

> The jury's knowledge that Ochoa was in custody, that he had previously been convicted, and that the proceeding was related to a criminal matter was not violative of Lambert v. State, 2003 OK CR 11, 71 P.3d 30. While evidence relating to his criminal conviction and sentence of death are not relevant to the proceeding, the jury's knowledge that the proceeding was related to a criminal matter and that Ochoa was in custody and had been convicted of a crime does not create the prejudicial effect Lambert sought to avoid. Ochoa's counsel was not ineffective for not objecting to the trial court's and the prosecutor's remarks informing the jury that Ochoa had been convicted of a crime and/or that this was a criminal related matter.

Ochoa, 136 P.3d at 667.

---

[5] Regarding information that the trial involved a criminal case, Petitioner also makes a cursory allegation that "[t]o the extent that trial counsel failed to object and/or injected such information also, Ochoa received ineffective assistance of counsel." (Pet. at 21 n. 3)

Atkins left to the states the task of developing appropriate ways to enforce the constitutional restriction against execution of the mentally retarded. Atkins, 536 U.S. at 317. In Lambert v. State, 71 P.3d 70 (Okla. Crim. App. 2003), the OCCA determined that only evidence pertaining to mental retardation issues were appropriate on remanded mental retardation trials. "The jury should not hear evidence of the crimes for which Lambert was convicted, unless particular facts of the case are relevant to the issue of mental retardation. Any such evidence should be narrowly confined to that issue." Id. at 31.

As Petitioner identifies, the jury was informed that he was in custody and had been convicted of a crime, and because of that fact would be escorted by the Sheriff's Deputy. No evidence of the facts pertaining to his crimes was expressed to the jury. As expressed by the OCCA, informing the jury Petitioner had previously been convicted of a crime and was currently in custody does not rise to the level of the prejudicial effect sought to be avoided by Lambert. More importantly, Petitioner has not demonstrated the OCCA's determination was contrary to, or an unreasonable application of, clearly established federal law.

Regarding the orange jail coveralls and the shock sleeve, the OCCA summarized the following which transpired prior to trial:

> In his third claim of error, Ochoa contends the trial was fundamentally unfair because the jury learned of Ochoa's prior convictions and because the jury saw Ochoa wearing orange jail overalls and a "shock sleeve." The record reflects Ochoa chose not to dress out; and, following counsel's request that the trial court admonish him not to act inappropriately during the trial, Ochoa responded to the trial court's admonishments with obvious upset. After the trial court advised Ochoa he would be removed from the court room if he were to be disruptive, Ochoa responded that he was "being railroaded anyway, so it didn't matter to" him. At this point the trial court asked the deputy to put on "the sleeve," noting that "it may ensure that he won't behave inappropriately." After the deputy left with Ochoa, the trial court stated, "I've observed them with that on. They don't seem to be a problem." When Ochoa returned to the court room, counsel said Ochoa wanted to make a record on

14

"the sleeve." The trial court asked, "he objects to it?" Upon counsel's affirmative response, the trial court stated, "he was going to cause a problem, now he's not."

Ochoa, 136 P.3d at 666-67.[6]

> The OCCA determined it was not error for Petitioner to be dressed in "jail-orange":
>
> It is error to compel an accused to appear before a jury in prison clothing where a timely request has been made for civilian clothing. Rhinehart v. State, 1980 OK CR 16, ¶ 8, 609 P.2d 781, 783. However here, the record shows Ochoa's decision to appear before the jury in jail dress was his own. He was compelled by no one but himself. We find no Fourteenth Amendment violation where Ochoa himself made the decision to appear in jail dress and no request for civilian clothing appears in the record. Estelle v. Williams, 425 U.S. 501, 512-513, 96 S.Ct. 1691, 1697, 48 L.Ed.2d 126 (1976).

Id. at 667.

In Estelle v. Williams, 425 U.S. 501 (1976), the Supreme Court held that although the state cannot, consistent with the Fourteenth Amendment, compel an accused to stand trial before a jury dressed in prison clothes, the failure to make an objection to the court is sufficient to negate the presence of compulsion necessary to establish a constitutional violation. Id. at 512-13. The Court found in Estelle that there was nothing in the record to warrant a conclusion that the defendant was compelled to stand trial in prison clothes, reversed the judgment of the Court of Appeals granting relief, and remanded for further proceeding consistent with its determination. Id.

Here, it is evident that the trial court did not compel Petitioner to wear the jail-orange prison clothes. Not only was he not compelled, but Petitioner himself made the decision regarding the clothing he wore at the trial. Prior to trial and the presence of the jury panel, the following record was made to the court by Petitioner's counsel:

---

[6] Petitioner's own choice to wear the orange jail coveralls also informed the jury, prior to any comments by the court or the attorneys, that he was in custody.

> THE COURT: Okay. Do you want to make a record? You want to start with the jail uniform?
>
> MS. BAIER: Yes, Your Honor. We're on the record. Mr. Ochoa has chosen not to dress out and he's in orange. I don't believe he's cuffed, but I believe he's in his jail uniform and he chooses to do so. He would also like to make a record about me, I believe.

(Tr., Vol. I, p. 12.)

In <u>Estelle</u>, the Supreme Court stated that making a defendant appear in prison garb poses such a threat to the fairness of the fact finding process that it must be justified by an essential state policy. <u>Id.</u> at 503, 505. Here, however, there is no evidence to demonstrate Petitioner was "forced to trial in county jail orange coveralls" as he asserts in his Petition. Conversely, he chose to wear the prison garb. Petitioner has failed to demonstrate the determination of the OCCA was contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court.

Petitioner additionally asserts that the fact he was forced to wear a "shock sleeve" rendered his trial fundamentally unfair. Prior to the start of his trial, and out of the presence of the jury panel, the following discussion transpired:

> MS. BAIER: I'm not sure if Mr. Ochoa has been advised, but I believe it would be appropriate for the Court to advise Mr. Ochoa that if there's any interruptions that - - what the consequences of that would be.
>
> THE COURT: I'll bet you know, don't you? Mr. Ochoa, do you understand you don't want to do something stupid that you won't be here? Do you understand that? You won't be at the trial?
>
> THE DEFENDANT: You can leave me upstairs, if you want.
>
> THE COURT: Pardon me?
>
> THE DEFENDANT: You can leave me upstairs, if you want.
>
> THE COURT: That's up to you. You can do that, but if you get disruptive, you're going to be upstairs.
>
> THE DEFENDANT: This is a railroad anyways.
>
> THE COURT: Pardon me?
>
> THE DEFENDANT: Doesn't matter to me. I'm being railroaded anyway, so it doesn't matter to me.

THE COURT:  Well, you have a right to be here.  And if you decide that you don't want to, you're going to have to waive that affirmatively and on the record.

THE DEFENDANT:  I'm not waiving anything.

THE COURT:  Okay.  Then have a is [sic] seat over there.

MS. BAIER:  Thank you, Judge.

THE COURT:  Do you have the sleeve?

DEPUTY MCCORD:  I can put it on.

THE COURT:  Wouldn't be a bad idea, just in case.

DEPUTY MCCORD:  Do yo want me to go do it now?

THE COURT:  Yeah, if he's going to do - - if he wants to act up.  It may ensure that he won't behave inappropriately.

(Whereupon, Deputy McCord exits the courtroom with the defendant).

THE COURT:  I've observed them with that on.  They don't seem to be a problem.

* * *

MS. BAIER:  Apparently he wants to make a record on the sleeve.

THE COURT:  He what?

MS. BAIER:  He wants to make a record on the sleeve.

THE COURT:  Make it.  He objects to it?

MS. BAIER:  Uh-huh.

THE COURT:  He was going to cause a problem, now he's not.

(Tr., Vol. I, pp. 14-16.)

Later, Petitioner made a record with the trial court of his objection to the shock sleeve:

MS. BAIER:  And, Judge, Mr. Ochoa would like to speak with you about the sleeve on the record.

THE COURT:  Go ahead, sir.

THE DEFENDANT:  I haven't done or said anything to warrant this.  I mean, why are you putting it on my arm?

THE COURT:  Because you had told Ms. Rhone that you were going to be disruptive and - -

THE DEFENDANT:  I have sit [sic] over there, respected the Court.  Like I said, I haven't said anything.  I haven't disrupted the process.

THE COURT:  You have not and probably will not with that arm on, with the sleeve on, and that's the purpose so that you can sit here and listen to the case without influencing the jury against you, you know.  Anything you do is just going to be against you with these people.

THE DEFENDANT:  I mean you have this contraption on my arm.

THE COURT:  It's just a black, unmarked sleeve.  It just says, don't do something stupid.

THE DEFENDANT:  Like blackmail.

THE COURT:  No, like insurance, precautionary, okay?  We'll be in recess

until 1:30.

> THE DEFENDANT:  No way you're going to get it off through the process?
>
> THE COURT:   Well, let's see how you do.  You seem prone to do something, you know.  I don't know.
>
> THE DEFENDANT:  Like I said, I haven't done or said anything.
>
> THE COURT:   And that's why it's on, so you don't, okay?

(Tr., Vol. I, pp. 54-55.)[7]

Petitioner raised this issue with the OCCA. The court began its analysis stating:

> Ochoa's presence before the jury in the shock sleeve is a more difficult matter.  The record does not show Ochoa's counsel objected to the use of such restraint, however Ochoa himself repeatedly objected to its use.  The Fifth and Fourteenth Amendments prohibit the use of physical restraints visible to a jury absent a trial court determination, in the exercise of its discretion, that the restraints are justified by a state interest specific to a particular trial. Deck, 544 U.S. at 629, 125 S.Ct. at 2012. The Supreme Court extended this legal principle beyond guilt/innocence proceedings and reversed a death sentence reached by a jury in a trial where a defendant was shackled with leg irons, handcuffs, and a belly chain during the penalty stage of trial. Id. at 2014.

Ochoa, 136 P.2d at 667-68.

Petitioner relies on Deck v. Missouri, 544 U.S. 622 (2005), to support his assertion that he was prejudiced by the combination of wearing the shock sleeve, being dressed in jail clothes, and having the jury informed that he had been found guilty of a crime and was currently incarcerated. In Deck, the Supreme Court held that the Due Process clause prohibits the routine use of physical restraints visible to the jury during both the guilt phase and penalty phase of a capital trial. Id. at 635. The Court based its decision on three fundamental principle: (1) the defendant is presumed innocent; (2) the defendant must have access to counsel; and, (3) the court must seek to maintain a judicial process that is a dignified process. Id. at 630-32.

---

[7] There is no indication in the record of whether Petitioner wore the shock sleeve and/or the jail-orange coveralls the second day of trial.  There is also nothing in the record to indicate that the shock sleeve was ever activated during the trial.

After a thorough analysis under both state and federal law, the OCCA determined:

> Here the record does not show the shock sleeve was visible to the jury. Even if it were visible, we doubt the jury's ability to see the shock sleeve was any more prejudicial to Ochoa than was the fact that the jury saw Ochoa wearing his jail clothing and Ochoa himself made the decision to dress out in jail clothing. Ochoa does not claim the shock sleeve prevented him from physically or mentally assisting his counsel at the mental retardation hearing. While this Court finds the trial court erred and abused its discretion by ordering Ochoa to wear the shock sleeve, Ochoa has not proven this error had a substantial influence on the outcome of the proceeding and has not shown prejudice. See e.g., U.S. v. McKissick, 204 F.3d 1282, 1299 (10th Cir.2000)(court will not presume prejudice where there was no evidence jurors noticed the stun belt).

Ochoa, 136 P.3d at 670.

The OCCA's determination of harmless error was neither contrary to, nor an unreasonable application of, clearly established federal law as determined by the Supreme Court. In Brecht v. Abrahamson, 507 U.S. 619 (1993), the Supreme Court held that a petitioner is entitled to relief only if an error had a "substantial and injurious effect or influence in determining the jury's verdict." Id. at 623 (quoting Kotteakos v. United States, 328 U.S. 750. 776 (1946)). Although the OCCA found that the trial court's use of the shock sleeve was error and an abuse of discretion, Petitioner has not shown the error had a substantial and injurious effect on the verdict. Petitioner did not demonstrate, nor does the record reflect, that the shock sleeve was visible to the jury, that it hindered his ability to communicate with his attorney, or that he was prejudiced by wearing it. Further, the only evidence and testimony presented at trial was that Petitioner was not mentally retarded at the time of the trial, and that the expert could not state it was more probable than not that he was mentally retarded at the time of the crime.

Petitioner asserts in footnote 3 of his Petition that he received ineffective assistance of counsel when his attorney failed to object to and/or injected information regarding Petitioner having

been convicted of a crime. The Supreme Court set forth the proper standard for determining ineffective assistance of counsel in <u>Strickland v. Washington</u>, 466 U.S. 668 (1984).

> In <u>Strickland</u>, the Supreme Court held that "[a] convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components." 466 U.S. at 687, 104 S.Ct. 2052. "First," the Court noted, "the defendant must show that counsel's performance was deficient." <u>Id.</u> "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." <u>Id.</u> "Second," the Court noted, "the defendant must show that the deficient performance prejudiced the defense." <u>Id.</u> "This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." <u>Id.</u> "Unless a defendant makes both showings," the Court held, "it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable." <u>Id.</u>

<u>Gilson v. Sirmons</u>, 520 F.3d 1196, 1245 (10th Cir. 2008). The OCCA determined that Petitioner's counsel was not ineffective for not objecting to the trial court's and the prosecutor's remarks informing the jury that he had been convicted of a crime and that the mental retardation trial was a criminally related matter. <u>Ochoa</u>, 136 P.3d at 667.

Petitioner has not demonstrated that his counsel's performance was deficient or that he was prejudiced by such performance. The OCCA found no error in informing the jury that the trial was related to a criminal matter. Further, no prejudice can be shown due to the fact that the only testimony and evidence presented was Petitioner's expert's opinion that he was not mentally retarded and that she could not state more probably than not that he was mentally retarded at the time of the crime. Accordingly, Petitioner's third ground for relief is denied in its entirety.

<u>Ground 4:</u>     <u>Cumulative error</u>.

In his final ground for relief, Petitioner claims collective consideration of the individual errors in his trial demonstrates that their cumulative effect was not harmless and rendered his trial fundamentally unfair. He sets forth the following as trial error: (1) he was branded a convicted,

currently incarcerated felon in front of the jury; (2) he was "forced" to wear orange jail coveralls and a shock sleeve; (3) he was denied the right to present live witnesses on his own behalf; (4) he was improperly saddled with the burden of proof; and, (5) he faced a jury deciding a constitutionally irrelevant question regarding his current mental retardation as opposed to his mental condition at the time of the crime. (Pet. at 25-26.)

The OCCA denied Petitioner's cumulative error assertion on his second post-conviction application: "The single error identified in this appeal did not render Ochoa's trial fundamentally unfair or deprive him of due process. Where only one error is identified and it does not warrant relief, there can be no error by accumulation. Hope v. State, 1987 OK CR 24, ¶ 12, 732 P.2d 905, 908." Ochoa, 136 P.3d at 670.

Cumulative error analysis focuses on harmless errors' effect on the jury's verdict and the fairness of the trial:

> A cumulative-error analysis merely aggregates all the errors that individually have been found to be harmless, and therefore not reversible, and it analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless. Unless an aggregate harmless determination can be made, collective error will mandate reversal, just as surely as will individual error that cannot be considered harmless.

Darks v. Mullin, 327 F.3d 1001, 1018 (10th Cir. 2003)(quoting United States v. Rivera, 900 F.2d 1462, 1477 (10th Cir. 1990)). Only actual errors are to be considered in determining whether a defendant's right to a fair trial was violated. Le v. Mullin, 311 F.3d 1002, 1123 (10th Cir. 2002); see also Rivera, 900 F.2d at 1470-71 ("[A] cumulative error analysis should evaluate only the effect of matters determined to be error, not the cumulative effect of non-errors.").

In the instant case, and as determined by the OCCA, only the fact that the trial court required Petitioner to wear a shock sleeve during trial was considered error. That error was found to be

harmless both by the OCCA and this Court.  Accordingly, there is no cumulative error and Petitioner's fourth ground for relief is denied.

## IV.  Conclusion

After a complete review of the trial transcripts of the mental retardation trial, the mental retardation trial record, briefs filed by Petitioner and Respondent, and the applicable law, the Court finds that Respondent's Motion to Dismiss (Dkt. No. 13) is DENIED.  The Court further finds Petitioner's request for relief in his *Petition For a Writ of Habeas Corpus* (Dkt. No. 1) to be without merit.  ACCORDINGLY, habeas relief on all grounds is **DENIED**.  A judgment will enter accordingly.

IT IS SO ORDERED this 10th day of March, 2010.

DAVID L. RUSSELL
UNITED STATES DISTRICT JUDGE